1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BELLA-CHRISTINA BIRRELL,                No.  2:14-cv-01024 JAM DB

12                  Plaintiff,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   JOYCE BANZHAF, et al.,

15                  Defendants.

16

17        Plaintiff, Bella-Christina Birrell, is a state prisoner proceeding pro se and in forma

18   pauperis with a complaint under 42 U.S.C. § 1983.  Therein, Birrell asserts federal claims under

19   the First and Fourteenth Amendments, as well as state claims for defamation and negligence.  The

20   gravamen of Birrell's claims is that defendants violated her rights by falsifying a report about her

21   and excluding her from certain activities because of her gender.

22        Defendant Joyce Banzhaf, who is proceeding pro se, moves to dismiss Birrell's claims

23   against her on various grounds.  Birrell's § 1983 claims against Banzhaf are not cognizable

24   because she not adequately alleged that Banzhaf was acting under color of state law.  However,

25   Birrell has stated a cognizable state-law claim that Banzhaf defamed her.  Accordingly, as

26   discussed below, the motion to dismiss should be granted in part and denied in part.

27   ////

28   ////

                                           1

1   **I.      BACKGROUND**

2          Birrell is a transgender inmate at the California Medical Facility ("CMF"), a

3   medical/correctional facility located in Vacaville, California.  (Sec. Am. Compl. ¶ 3 (ECF No.

4   14).)  The following current and former defendants are relevant to Banzhaf's motion to dismiss.

5          Banzhaf was the "Lead Coordinator" of the "Alternatives to Violence Project."  (Id. ¶ 7.)

6   The Alternatives to Violence Project ("AVP") "is an independ[e]nt, non-profit organization

7   providing workshops on preventing violence among inmates within the California Department of

8   Corrections and Rehabilitation ['CDCR'] . . . ."  (Id.)  The AVP program "is sponsored [by] and

9   works under the direct auspices, supervision and authority" of the CDCR."  (Id. ¶ 8.)  Banzhaf's

10  function was to "coordinate" the AVP program at CMF.  (Id.)  Former defendant Kary Shender

11  was also an AVP coordinator whose function was to assist in coordinating the program.  (Id. ¶

12  10.)

13         Defendant Landon Bravo started to work at CMF at an unspecified time.  (See id. ¶ 12.)

14  Bravo took over as "Community Resource Manager" in the spring of 2012.  (See id. ¶¶ 46, 49.)

15  As Community Resource Manager, Bravo was the "director supervisor" of Banzhaf and Shender.

16  (Id. ¶ 12.)  Bravo was also responsible for authorizing the AVP program and for Banzhaf and

17  Shender to conduct it.  (Id. ¶ 12.)  Pursuantly, Bravo "created and implemented policies and

18  procedures" for Banzhaf and Shender to carry out.  (Id.)  Bravo also had to ensure that Banzhaf

19  and Shender complied with state and federal law in coordinating the AVP program.  (See id. ¶

20  27.)  According to Birrell, Bravo was acting "under [the] color . . . of state law" at all times

21  relevant to the second amended complaint.  (Id. ¶ 13; see also id. ¶ 95.)

22         The second amended complaint contains several allegations regarding Bravo's delegation

23  of authority over the AVP program to Banzhaf.  Birrell alleges that, at all relevant times, Banzhaf

24  "was acting on behalf of, and with the permission, authority and approval" of Bravo.  (Id. ¶ 9.)

25  Birrell further alleges that Bravo authorized Banzhaf to act "under color . . . of [s]tate law . . . as a

26  'de jure' [a]gent of the [s]tate."  (Id.)  Yet Birrell alleges that Banzhaf was "forbidden and

27  prohibited from carrying out the duties, tasks, and administrative responsibilities of [Bravo]."  (Id.

28  ¶ 29; see also id. ¶ 114.)

1    In 2007, the AVP program began holding workshops at CMF "to teach inmates of the

2    CDCR alternative, peaceful ways of dealing with disputes." (Id. ¶ 35.) Over time, "favoritism

3    was . . . employed in the selection of inmates who were being chosen to participate in the

4    workshops and other AVP activities." (Id.) Birrell characterizes these favored inmates as the

5    "Inmate Special Interest Group." (Id. ¶ 42.)

6    In February 2010, to challenge this favoritism, Birrell and other inmates "filed a

7    Group/Class Action Inmate Administrative Appeal ['group appeal']." (Id.) On March 17, 2010,

8    Birrell, Banzhaf, and Shender attended a meeting for the purpose of addressing the concerns the

9    raised in the group appeal. (Id. ¶ 41.) According to Birrell, Shender left the meeting and told the

10   Inmate Special Interest Group what was being said in the meeting, what the contents of the group

11   appeal were, and who had signed the appeal. (Id. ¶ 42.) As a result, "serious and hostile

12   confrontations" broke out between the Special Inmate Interest Group and the group appeal

13   participants. (Id. ¶ 43.) These confrontations lasted "for months." (Id.)

14   On March 30, 2010, the warden partially granted the appeal based on the determination

15   that the "procedures for monitoring the selection of inmate participants and facilitators within the

16   AVP [p]rogram were flawed." (Id. at 63.) In response, new procedures "were created to better

17   monitor the [AVP] [p]rogram and the selection of inmates as participants and facilitators." (Id.)

18   Some months later, due to continuing problems with the administration of the program, Banzhaf

19   and Shender were removed from CMF and barred from operating the program "until they would

20   agree to follow all of the applicable CDCR rules, regulations and policies." (Id. ¶ 45.)

21   In the spring of 2012, the program returned to CMF "in an attempt to restart . . . without

22   all of the . . . corruption that had caused its shut-down in 2010." (Id. ¶ 46.) During this period,

23   Birrell and the inmates who had pursued the group appeal were being harassed and mistreated as

24   a result of the "wrongful dissemination of the [allegedly] confidential information contained in

25   said appeal." (Id. ¶ 50.) The same inmates were also "being deliberately excluded from

26   participation in the new . . . program that was being re-started at CMF." (Id.)

27   ////

28   ////

3

In Birrell's words, this "covert punishment [was] being inflicted on the [a]ppellants for engaging in a [c]onstitutionally protected activity." (Id.)  Birrell also attributes this harassment to her being a "transgender or gender non-conforming individual." (Id. ¶ 47.)

Around that time, Banzhaf and Shender turned over control of the AVP program to a group of inmates similar to the Inmate Special Interest Group. (Id. ¶ 52.)  These inmates worked for "Volunteers of Vacaville." (Id.)  They also were "deciding who would be participating as workshop facilitators." (Id.)

In July 2012, Birrell attended a workshop for facilitators of the AVP program. (Id. ¶¶ 53, 55.)  Jose Sandoval participated in this workshop. (Id. ¶ 54.)  Sandoval was an inmate who worked for Volunteers of Vacaville and "performed clerical duties for the AVP program." (Id. ¶¶ 24, 83.)  Sandoval "announced to the entire group in attendance" that Bravo had authorized him to "write CDCR 128 [General] Chronos" on Bravo's behalf. (Id. ¶ 54.)  "General Chrono [i.e., chronological report] means a CDC[R] Form 128-B . . . which is used to document information about inmates and inmate behavior." Cal. Code Regs. tit. 15, § 3000; see also Perrotte v. Sullivan, No. 1:08-cv-01804-AWI-JLT HC, 2010 WL 476006, at *2 (E.D. Cal. Feb. 4, 2010), report and recommendation adopted, No. 1:08-cv-01804-AWI-JLT HC (Mar. 17, 2010).

Birrell alleges that, after the July 2012 AVP workshop, she was "consistently and repeatedly passed over" to be a facilitator. (Sec. Am. Compl. ¶ 55 (ECF No. 14).)  She further alleges that "other similarly situated inmates who meet the stereotypical male prison appearance [] were . . . repeatedly and consist[e]ntly used." (Id. ¶ 55.)  Birrell adds that Banzhaf "personally ordered" her exclusion from the AVP program. (Id. ¶ 57.)

On January 3, 2013, Birrell asked Bravo why "inmates who had signed the appeal in 2010[] were being excluded and passed over from attending the AVP workshops." (Id. ¶ 61.)  Bravo informed Birrell that he no longer ran the program and had delegated control of it to unspecified individuals. (Id. ¶ 63.)  Bravo also told Birrell that she should talk to Banzhaf. (Id. ¶ 62.)

////

////

4

1    The next day, Birrell went to see Banzhaf but instead encountered Shender.  (Id. ¶ 65.)

2  Birrell told Shender that she wanted to talk to Banzhaf "to do a follow-up on some of the issues

3  that had been decided in the previous [group appeal]."  (Id.)

4    In April 2013, Birrell discovered a general chrono ("first chrono") purporting to be

5  electronically signed by Banzhaf.  (Id. at 69.)  The first chrono also bore the handwritten, printed

6  initials "LB."  (Id.)  According to the first chrono, Birrell went to a workshop on January 4, 2013

7  and tried to convince Shender to put Sidney Ross Deegan, Jr., an inmate and co-signer of the

8  2010 group appeal, on the list of participants.  (See id.; see also id. ¶ 60.)  The first chrono further

9  stated that "Birrell told [Shender] I want this to be resolved amicably or it could go the way it

10  went the other time."  (Id. at 69.)

11    Birrell alleges that the first chrono "was a false . . . document containing a concocted,

12  false allegation that . . . [she] . . . made a 'veiled' threat" to Shender.  (Id. ¶ 67.)  Further, Birrell

13  alleges that the first chrono was written to retaliate against her for participating in the group

14  appeal.  (Id. ¶¶ 98, 109.)

15    Immediately thereafter, Birrell filed an inmate appeal based on her belief that an inmate

16  wrote the first chrono or that "Bravo had written [it] for some . . . nefarious purpose since the

17  information contained in [it] was untrue."  (Id. ¶ 71.)  However, during an administrative

18  investigation, Bravo denied knowledge of the first chrono.  (Id. at 65; see also id. ¶ 72.)

19    On July 16, 2013, Banzhaf faxed CDCR staff a copy of the first chrono ("second

20  chrono").  (Id. ¶ 74; see also id. at 76.)  Although the second chrono's narrative was the same as

21  that of the first, the second purported to contain the handwritten signature of Banzhaf.  (Id. at 70;

22  see also id. ¶ 75.)  A few days later, Banzhaf stated via email that she wanted the chrono to

23  remain in Birrell's file.  (Id. at 76; see also id. ¶ 74.)

24  ////

25  ////

26  ////

27  ////

28  ////

1    On July 17, 2013, the associate warden issued a first-level appeal response.  (Id. at 74.)

2    Although the associate warden granted Birrell's request for "no retaliation," he denied her request

3    for removal of the chrono from her central file "due to the chrono being informational in nature."

4    (Id.)  A week later, the warden issued a second-level appeal response.  (Id. at 75.)  The warden

5    likewise denied Birrell's request for removal of the chrono, reasoning that it was "informational"

6    and not "disciplinary."  (Id. at 76.)

7    On August 21, 2013, Birrell went before the parole board.  (Id. ¶81.)  The district attorney

8    allegedly cited the falsified chrono in stating that Birrell "was manipulating staff and making

9    indirect threats."  (Id. ¶ 81.)  According to Birrell, this action resulted in her "receiving a five (5)

10   year denial after serving some thirty-plus (30+) years without any disciplinary write-ups."  (Id.)

11   Birrell also alleges that the false chrono "would forever follow [her] and be later used by the

12   parole board to deny [her] a future parole date."  (Id. ¶ 97.)

13   During the pendency of Birrell's third-level appeal,  she discovered that AVP program

14   documents "were being kept . . . at the Volunteers of Vacaville, and were under the direct control

15   of the very same group of [inmates] that had been prohibited from having any access to said . . .

16   records based on the appeal decision of 2010."  (Id. ¶ 80.)  Based on this discovery, Birrell told

17   Bravo in November 2014 that inmates had written the chrono, forged his initials on it, and placed

18   it into her central file.  (Id. ¶ 82.)  According to Birrell, Bravo then admitted that Sandoval wrote

19   the chrono.  (Id. ¶ 83.)

20   On October 1, 2013, the hearing examiner issued a third-level decision denying Birrell's

21   appeal.  (Id. at 77.)  The hearing examiner reasoned that Birrell failed to show that the underlying

22   incident was untrue and that CDCR regulations provided that the chrono was the appropriate

23   document for recording the incident.  (See id.)

24   **B.    Procedural Background**

25   Birrell filed a complaint under § 1983, which she amended.  (Am. Compl. (ECF No. 8).)

26   In her amended complaint, Birrell asserted retaliation, due process, and equal protection claims

27   under § 1983, as well as a claim for conspiracy under § 1985.  (Id. ¶¶ 64–83.)

28   ////

1    On December 10, 2014, the court screened the amended complaint. (ECF No. 9.) The

2    court found that Birrell failed to adequately allege that defendants were "acting under color of

3    state law" within the meaning of § 1983. (Id. at 9.) Further, the court found that Birrell's due

4    process, equal protection, and conspiracy claims were not cognizable. (Id. at 10–11.) Regarding

5    the conspiracy claim, the court found that Birrell failed to support it with "specific" factual

6    allegations. (Id. (citing Karim-Panahi v. L.A. Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988)).)

7    The court dismissed Birrell's amended complaint with leave to amend. (Id. at 12.)

8    Birrell filed her second amended complaint on February 4, 2015. (Sec. Am. Compl. (ECF

9    No. 14).) Therein, Birrell sued multiple defendants and asserted multiple causes of action,

10   including federal claims for violations of the First and Fourteenth Amendments, as well as state-

11   law claims for defamation and negligence. (See Sec. Am. Compl. ¶¶ 93–137 (ECF No. 14).)

12   On March 25, 2016, Judge Mendez issued an order, (ECF No. 20), adopting the findings

13   and recommendations that Judge Delaney issued on January 19, 2016, (ECF No. 18). In her

14   findings and recommendations, Judge Delaney found that Birrell "stated federal civil rights

15   claims of (1) retaliation, (2) violation of due process and (3) violation of plaintiff's right to equal

16   protection only as to defendants Banzhaf and Bravo." (Id. at 3.) Judge Delaney further found

17   that Birrell "stated state law claims of defamation and negligence against defendants Banzhaf and

18   Bravo[.]"[1]  (Id.) Additionally, Judge Delaney found that all other defendants and causes of

19   actions should be dismissed. (Id.)

20   On June 27, 2016, Bravo filed a motion to dismiss. (Bravo Mot. Dismiss (ECF No. 28).)

21   Bravo sought dismissal of Birrell's due process and negligence claims against him. (ECF No. 45

22   at 8.) On March 3, 2017, the undersigned issued findings and recommendations on this motion.

23   (See generally id.) The undersigned found that Birrell failed to state a cognizable due process

24   claim against Bravo. (Id. at 10.) Further, the undersigned found that Birrell stated a cognizable

25   claim against Bravo for defamation. (Id. at 11.)

26   ////

27   _____

[1] This finding was partly erroneous as Birrell did not assert a negligence claim against Banzhaf.
28   (Sec. Am. Compl. ¶¶ 100–106 (ECF No. 14).)

7

In so finding, the undersigned reasoned that Birrell's allegations supported "a plausible inference that Bravo participated in the [alleged] falsification of the chrono." (Id.)

Banzhaf answered and moved to dismiss on December 23, 2016. (Banzhaf Mot. Dismiss (ECF No. 42).) Banzhaf argues that all of Birrell's claims against her are not cognizable. (See id. at 7–10.) Banzhaf contends that Birrell's defamation claim fails because the chrono "was not false, and therefore not defamatory." (Id. at 7.) To support this contention, Banzhaf asserts that she wrote the chrono at Bravo's suggestion and that it accurately reflected what Shender told her about Shender's conversation with Birrell. (Id.) Banzhaf adds that she had no reason to disbelieve Shender. (Id.)

Banzhaf argues that Birrell's retaliation claim fails because Birrell was a facilitator at one workshop after filing the group appeal, which negates any inference of retaliation. (Id. at 8.) Banzhaf adds that she did not use Birrell as a facilitator after that because Birrell failed to participate in "pre- and post-workshop activities." (Id.) Furthermore, Banzhaf argues that Birrell's due process claim fails because she received a copy of the chrono before her parole hearing and had time to file an administrative appeal to challenge it. (Id. at 9.) In addition, Banzhaf argues that Birrell's equal protection claim fails because her decision not to use Birrell as a facilitator was not based on invidious discrimination. (Id.)

On March 3, 2017, Birrell opposed Banzhaf's motion to dismiss. (Opp'n Banzhaf Mot. Dismiss (ECF No. 46).) Concerning her defamation claim, Birrell insists that Shender's account of their conversation is false. (Id. at 6.) Further, Birrell accuses Banzhaf of acting in "reckless disregard of whether the statement was true or not" because she relied solely on what Shender told her. (Id.) In terms of retaliation, Birrell notes that Banzhaf does not dispute that she declined to use Birrell as a facilitator after the July 2012 workshop. (Id. at 12.) Additionally, Birrell maintains that Banzhaf's assertion that she failed to participate in pre- and post-workshop activities is untrue. (Id.)

Birrell argues that her due process claim is cognizable because the chrono contains a false, serious allegation against her and she did not have an opportunity to contest its truth. (Id. at 15.) Also, Birrell asserts that the chrono can be used to her detriment in the future because it is still in

1   her file.  (Id. at 16.)  As for equal protection, Birrell asserts that Banzhaf had no valid reason to

2   deny her from participating in the AVP workshops.  (Id. at 16–17.)  This fact, coupled with

3   Birrell's status as a transgender individual, supposedly shows that Banzhaf's motive to exclude

4   her from the workshops was discriminatory.  (See id.)

5   **II.      STANDARD OF REVIEW**

6          Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for motions to dismiss for

7   "failure to state a claim upon which relief can be granted."  In considering a motion to dismiss

8   pursuant to Rule 12(b)(6), the court must accept as true the allegations of the complaint in

9   question, Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted), and construe the

10  pleading in the light most favorable to the plaintiff, Jenkins v. McKeithen, 395 U.S. 411, 421

11  (1969); Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir. 1999).  Still, to survive

12  dismissal for failure to state a claim, a pro se complaint must contain more than "naked

13  assertion[s]," "labels and conclusions," or "a formulaic recitation of the elements of a cause of

14  action."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007).  In other words,

15  "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

16  statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore, a claim

17  upon which the court can grant relief must have facial plausibility.  See Twombly, 550 U.S. at

18  570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

19  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

20  Iqbal, 556 U.S. at 678.

21         In general, pro se pleadings are held to a less stringent standard than those drafted by

22  lawyers.  Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam).  The court has an obligation to

23  construe such pleadings liberally.  Bretz v. Kelman, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en

24  banc).  However, the court's liberal interpretation of a pro se complaint may not supply essential

25  elements of the claim that were not pled.  Ivey v. Bd. of Regents of Univ. of Alaska, 673 F.2d

26  266, 268 (9th Cir. 1982).

27  ////

28  ////

1    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court "may generally consider only

2    allegations contained in the pleadings, exhibits attached to the complaint, and matters properly

3    subject to judicial notice." Outdoor Media Grp., Inc. v. City of Beaumont, 506 F.3d 895, 899 (9th

4    Cir. 2007) (citation omitted).

5    **III.    LEGAL ANALYSIS**

6          **A.    Subject Matter Jurisdiction**

7               1.    Legal Standards

8          "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by .

9    . . a court on its own initiative[] at any stage in the litigation . . . ." Arbaugh v. Y&H Corp., 546

10   U.S. 500, 506 (2006) (citation omitted).  That is, "[s]ubject matter jurisdiction can never be

11   forfeited or waived, and federal courts have a continuing, independent obligation to determine

12   whether subject matter jurisdiction exists." Mashiri v. Dep't of Educ., 724 F.3d 1028, 1031 (9th

13   Cir. 2013) (citation omitted).

14        "To establish § 1983 liability, a plaintiff must show both (1) [the] deprivation of a right

15   secured by the Constitution and laws of the United States, and (2) that the deprivation was

16   committed by a person acting under color of state law." Chudacoff v. Univ. Med. Ctr. of S. Nev.,

17   649 F.3d 1143, 1149 (9th Cir. 2011) (citations omitted).  "The 'under color of law' requirement

18   under § 1983 is the same as the Fourteenth Amendment's 'state action' requirement." Id. (citing

19   Lugar v. Edmondson Oil Co., 457 U.S. 922, 928 (1982)).  "Acting under color of state law is a

20   jurisdictional requisite for a § 1983 action." Gritchen v. Collier, 254 F.3d 807, 812 (9th Cir.

21   2001) (citing West v. Atkins, 487 U.S. 42, 46 (1988)).

22        "Although § 1983 makes liable only those who act 'under color of' state law, even a

23   private entity can, in certain circumstances, be subject to liability under section 1983." Tsao v.

24   Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012) (citation omitted).  "To determine

25   whether actions that allegedly caused the deprivation of a right are fairly attributable to the state

26   even though they were committed by private actors, [courts] follow a two-part approach[.]"

27   Florer v. Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 922 (9th Cir. 2011).  "First, the

28   deprivation must be caused by the exercise of some right or privilege created by the State or by a

1  rule of conduct imposed by the state or by a person for whom the State is responsible." Id. (citing

2  Lugar, 457 U.S. at 937).  "Second, the party charged with the deprivation must be a person who

3  may fairly be said to be a state actor." Id. (citing Lugar, 457 U.S. at 937).  Courts "start with the

4  presumption that conduct by private actors is not state action." Id. (citation omitted).  The

5  plaintiff bears the burden of pleading sufficient facts to support a plausible inference that the

6  defendant was a state actor.  See id. (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156

7  (1978)).

8          Here, for ease of analysis, the undersigned assumes that Birrell's allegations satisfy the

9  first prong.[2]  Therefore, under prong two, the undersigned considers whether one can fairly say

10  that Banzhaf is a state actor.

11          "What is fairly attributable [to the state] is a matter of normative judgment, and the

12  criteria lack rigid simplicity." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531

13  U.S. 288, 295 (2001).  "[N]o one fact can function as a necessary condition across the board for

14  finding state action[.]" Id.  "[N]or is any set of circumstances absolutely sufficient, for there may

15  be some countervailing reason against attributing activity to the government." Id. at 295–96

16  (citations omitted).

17          The Ninth Circuit "recognize[s] at least four different criteria, or tests, used to identify

18  state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and

19  (4) governmental nexus." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (citations

20  omitted).  "Satisfaction of any one test is sufficient to find state action, so long as no

21  countervailing factor exists." Id. (citation omitted).  The undersigned considers the "joint action"

22  test because it is the only one that relates to "the specific conduct of which the plaintiff

23  complains." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999) (citation omitted).

24  _____

25  [2] The Supreme Court's cases expounding the meaning of the first prong "have not been a model
of consistency." See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378 (1995) (citation

26  omitted).  For this reason, the Ninth Circuit does not invariably consider the first prong when
deciding whether state action is present. Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg.

27  Corp., 75 F.3d 1401, 1409 & n.5 (9th Cir. 1996); see also Brunette v. Humane Soc'y of Ventura
Cnty., 294 F.3d 1205, 1209–14 (9th Cir. 2002) (analyzing whether state action is present without

28  considering the first prong).

"To be engaged in joint action, a private party must be a 'willful participant' with the State or its agents in an activity which deprives others of constitutional rights." Brunette v. Humane Society of Ventura County, 294 F.3d 1205, 1211 (9th Cir. 2002) (citing Dennis v. Sparks, 449 U.S. 24, 27 (1980)). A private party is liable under this theory, however, only if its particular actions are inextricably intertwined with those of the government." Id. (citations omitted). A private party's particular actions are inextricably intertwined with those of the state when "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." Florer, 639 F.3d at 926. "A conspiracy between the State and a private party to violate another's constitutional rights may also satisfy the joint action test." Brunette, 294 F.3d at 1211 (citations omitted).

To prove a conspiracy between the state and private parties under § 1983, the plaintiff must show "an agreement or meeting of the minds to violate constitutional rights." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1540–41 (9th Cir. 1989) (citations omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." Id. at 1541 (citation omitted).

2.    Analysis

In this case, Birrell has inadequately alleged that the state has insinuated itself into a position of interdependence with Banzhaf. Granted, Banzhaf coordinated the AVP program at CMF. However, Birrell alleges that AVP is an independent, nonprofit organization whose purpose is to reduce violence among inmates through workshops. Birrell's bare allegation that CDCR sponsors and supervises the AVP program is insufficient to support an inference of "substantial . . . cooperative action." Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989).

Therefore, the undersigned considers whether Birrell has adequately alleged that Banzhaf and Bravo conspired to violate her constitutional rights, i.e., to falsify the chrono to retaliate against her for pursuing the group appeal. The undersigned focuses on this alleged constitutional violation because it is the only one that Birrell conceivably supported with allegations of conspiracy between Banzhaf and Bravo.

12

1    Here, one could not plausibly infer that Bravo conspired with Banzhaf to falsify the

2    chrono to retaliate against Birrell for pursuing the group appeal.  The second amended complaint

3    contains only two express allegations about conspiracy.  First, Birrell alleges that all of the

4    defendants "were acting within the course and scope of their positions and in joint participation

5    and under color of . . . state law and therefore are liable to [her] under the joint participation

6    doctrine." (Sec. Am. Compl. ¶ 32 (ECF No. 14).)  Second, Birrell alleges that Banzhaf

7    "intentionally and deliberately collud[ed] with [all of] the other named defendants" in falsifying

8    the chrono.  (Id. ¶ 77.)  These vague and conclusory allegations, which do not even mention

9    Bravo specifically, lack the "factual specificity" necessary to support a plausible inference of

10   conspiracy.  See Karim-Panahi, 839 F.2d at 626 (citations omitted).  Furthermore, while Birrell

11   alleges that Banzhaf acted under color of state law, these allegations are equally vague and

12   conclusory.  Supra p. 2.  Ditto for Birrell's allegations that Bravo delegated his authority to her.

13   Supra p. 2.

14       Likewise, Birrell's remaining allegations fail to support a plausible inference that Bravo

15   and Banzhaf agreed to falsify the chrono to retaliate against her for the group appeal.  Birrell

16   alleges that Bravo did not become the Community Resource Manager until the spring of 2012,

17   and that the chrono was not falsified until January 2013.  These dates are more than two years

18   after Birrell filed the group appeal in February 2010.  This temporal gap negates an inference that

19   the group appeal caused Bravo to participate in the falsification of the chrono.  Cf. Clark Cnty.

20   Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) (per curiam) (allegedly retaliatory action taken

21   "20 months" after protected activity does not suggest causality "at all" in context of Title VII

22   retaliation claims).

23       Granted, the undersigned determined in her March 2017 findings and recommendations

24   that Birrell's allegations supported "a plausible inference that Bravo participated in the

25   falsification of the chrono."  (ECF No. 45 at 11.)  But merely participating in the falsification of

26   the chrono does not imply that Bravo reached an agreement with Banzhaf to retaliate against

27   Birrell for the group appeal.  Birrell's allegations support the following plausible inferences: (1)

28   Banzhaf and/or inmate Sandoval wrote the chrono; (2) Bravo knew that they wrote the chrono;

13

1    and (3) each of these three individuals knew that the chrono was false or was reckless in

2    ascertaining its truth.  Yet Birrell alleges no specific facts suggesting that Bravo and Banzhaf

3    actually agreed to falsify the chrono to retaliate against her for the group appeal.

4        As indicated, Birrell's remaining claims fail to support a plausible inference that Bravo

5    and Banzhaf conspired to violate her constitutional rights.  Birrell also alleges that she was

6    harassed for pursuing the group appeal.  But she does not allege that Bravo participated in this

7    harassment, which broke out at least two years before he became the Community Resource

8    Manager.

9        Birrell's due process claim does not support a plausible inference of conspiracy.  Birrell

10   bases this claim on the same operative allegations on which she bases her retaliation claim.

11   However, as shown above, one cannot plausibly infer the existence of a conspiracy between

12   Bravo and Banzhaf from these allegations.

13       Birrell also alleges that Banzhaf excluded her from AVP workshops in reprisal for

14   pursuing the group appeal.  Yet Birrell does not allege that Bravo played a role in this decision.

15   Indeed, Birrell alleges that (1) Bravo delegated control of the workshops to unspecified persons

16   and (2) Banzhaf personally ordered her exclusion from them.  Nor does Birrell allege that Bravo

17   participated in the discrimination that she allegedly experienced because of her transgender

18   identify.

19       In short, one cannot plausibly infer that Banzhaf's alleged constitutional violations are

20   fairly attributable to the state.  Accordingly, Birrell has failed to state cognizable § 1983 claims

21   against Banzhaf.

22       **B.       Section 1983 Claims Against Banzhaf**

23       Birrell has stated due process, equal protection, and retaliation claims against Banzhaf.

24   The first two of these claims would not be cognizable even had Birrell adequately alleged that

25   Banzhaf is a state actor.

26            1.       Due Process

27       Birrell has failed to state a facially plausible due process claim against Banzhaf.  Birrell

28   bases this claim on the same factual allegations on which she bases her due process claim against

14

1  Bravo.  However, the undersigned already found that Birrell's due process claim against Bravo is

2  not cognizable.  (ECF No. 45 at 8–10.)  The undersigned incorporates that analysis by reference

3  and finds for the same reasons that Birrell's due process claim against Banzhaf is not cognizable.

4                2.      Equal Protection

5        "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

6  'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

7  direction that all persons similarly situated should be treated alike."  Lee v. City of Los Angeles,

8  250 F.3d 668, 686 (9th Cir. 2001) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S.

9  432, 439 (1985)).  "To state a claim under . . . § 1983 for a violation of the Equal Protection

10  Clause of the Fourteenth Amendment[,] a plaintiff must show that the defendants acted with an

11  intent or purpose to discriminate against the plaintiff based upon membership in a protected

12  class."  Id. (citation omitted).

13        Here, Banzhaf does not contest that Birrell, as a transgender individual, is a member of a

14  protected class.  Therefore, the issue is whether Banzhaf purposefully discriminated against

15  Birrell by allegedly falsifying the chrono, excluding her from participation in the AVP

16  workshops, and disseminating the contents of her group appeal.

17        "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of

18  consequences."  Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (citation omitted).  "It

19  implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in

20  part because of, not merely in spite of, its adverse effects upon an identifiable group."  Id.

21  Courts may look to the totality of the circumstances to ascertain whether "invidious

22  discriminatory purpose" animates a state official's challenged action.  See Washington v. Davis,

23  426 U.S. 229, 242 (1976).

24        In this case, Birrell has not adequately alleged that invidious discriminatory purpose

25  motivated Banzhaf's challenged actions.  Although Birrell alleges that similarly situated non-

26  transgender inmates were allowed to facilitate the AVP workshops, she does not allege in what

27  respects these inmates were similarly situated to her.  (See Sec. Am. Compl. ¶¶ 55, 126–27 (ECF

28  No. 14).)  Thus, this allegation is "a legal conclusion couched as a factual allegation."  Twombly,

15

550 U.S. at 555 (citation omitted).  Nor does Birrell plead any other "factual matter" supporting a

plausible inference that Banzhaf excluded Birrell from the AVP workshops due to her status as a

transgender individual.  Ashcroft, 556 U.S. at 678 (citation omitted).  The only other (vague)

allegation relating to invidious discrimination is that Birrell experienced harassment after

pursuing the group appeal due to being transgender.  (See Sec. Am. Compl. ¶ 47 (ECF No. 14).)

But Birrell also alleges that the harassment was due to her participation in the group appeal,

which undercuts the inference that the harassment was "because of" her transgender identity.  See

Feeney, 442 U.S. at 279 (citation omitted).  Furthermore, Birrell does not even expressly allege

that Banzhaf participated in this gender-based harassment.  (Sec. Am. Compl. ¶ 47 (ECF No.

14).)  In short, Birrell has not stated a cognizable claim that invidious discrimination motivated

Banzhaf's challenged actions.[3]

### C.      Whether to Grant Leave to Amend

The undersigned recommends the dismissal of Birrell's § 1983 claims against Banzhaf

with prejudice.  The court screened the amended complaint and determined that Birrell failed to

adequately allege that defendants were state actors for § 1983 purposes.  Furthermore, the court

gave Birrell guidance on how to plead that each defendant, acting under color of state law,

violated her constitutional rights.  (ECF No. 9 at 6–9.)  But Birrell has again failed to allege

facially plausible claims that Banzhaf acted under color of state law in allegedly violating her

federal rights.  Anderson v. Sy,  No. 11–17232, 2012 WL 4888402, at *1 (9th Cir. Oct. 16, 2012)

("[T]he district court's discretion to deny leave to amend is particularly broad where it has

afforded plaintiff one or more opportunities to amend." (citing Ferdik v. Bonzelet, 963 F.2d 1258,

1261 (9th Cir. 1992)).

Furthermore, the undersigned has carefully reviewed the parties' pleadings and papers and

there is no basis to infer that Birrell could cure the noted deficiencies by filing a third amended

complaint.  Additionally, as discussed above, Birrell's due process and equal protection claims

---

[3] Other than Birrell's failure to adequately allege that Banzhaf acted under color of state law, the undersigned does not suggest that her First Amendment retaliation claim against Banzhaf is facially implausible.

against Banzhaf would not be cognizable even had she adequately alleged that Banzhaf was acting under color of state law.  Polich v. Burlington N., Inc., 942 F.2d 1467, 1472 (9th Cir. 1991) (citation omitted) (dismissal of a pro se complaint is proper where "it is clear . . . that the complaint could not be saved by any amendment").  Accordingly, Birrell's § 1983 claims against Banzhaf should be dismissed with prejudice.

### D.    State Defamation Claim Against Banzhaf

"Under California law, '[l]ibel is a false and unprivileged publication by writing . . . which exposes any person to hatred,  contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'"  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 509–10 (1991) (quoting Cal. Civ. Code Ann. § 45).  "'The sine qua non of recovery for defamation . . . is the existence of a falsehood.'"  Baker v. L.A. Herald Exam'r, 42 Cal. 3d 254, 259 (1986) (quoting Letter Carriers v. Austin, 418 U.S. 264, 283 (1974)).

Here, Birrell has stated a cognizable defamation claim against Banzhaf.  While Birrell does not clearly allege whether Sandoval or Banzhaf wrote the chrono, her allegations support a plausible inference that Banzhaf participated in its creation.  Indeed, Banzhaf states in her motion to dismiss that she wrote the chrono.  Furthermore, while Banzhaf asserts that the chrono is true, Birrell has adequately alleged that it falsely accuses her of making a veiled threat to Shender when she merely expressed her desire to attend AVP workshops.  Additionally, Birrell's allegations plausibly support the inference that Banzhaf published the chrono because she allegedly told prison officials via email that she wanted it to remain in Birrell's file.  Accordingly, Birrell has stated a facially plausible defamation claim against Banzhaf.

## IV.    CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that Banzhaf's motion to dismiss (ECF No. 42) be granted in part and denied in part, with the result that Birrell's § 1983 claims against Banzhaf be dismissed with prejudice.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written

17

1    objections with the court and serve a copy on all parties.  The document should be captioned

2    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

3    objections shall be filed and served within seven days after service of the objections.  The parties

4    are advised that failure to file objections within the specified time may result in waiver of the

5    right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1157 (9th Cir. 1991).

6    Dated:  March 27, 2017

7

8    _____

9    DEBORAH BARNES
     UNITED STATES MAGISTRATE JUDGE

10

11

12   DLB:11
     DLB1/prisoner-civil rights/birr1204.mtd fr

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28